# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,

        Plaintiff,

        v.

U.S. DEPARTMENT OF JUSTICE, *et al.*

        Defendants.

Civil Action No. 12-01350 (BAH)
Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff Judicial Watch, Inc. brought this case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to challenge the processing by the defendants, the U.S. Department of Justice ("DOJ") and the U.S. Department of Homeland Security ("DHS"), of the plaintiff's FOIA request for records regarding a DHS program announced on June 15, 2012, referred to as the Deferred Action for Childhood Arrivals ("DACA"). Pending before the Court are cross-motions for summary judgment as to whether DHS has properly withheld two responsive documents under FOIA Exemption 5, 5 U.S.C. § 552(b)(5), as subject to attorney-client and deliberative process privileges.[1] For the reasons set out below, the Court grants the defendants' motion for summary judgment and denies the plaintiff's cross-motion for summary judgment.

---

[1] In response to the defendants' motion for summary judgment, the plaintiff has conceded that the defendants performed an adequate search and that all but two responsive documents are properly withheld. Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. & Supp. Pl.'s Cross-Mot. Partial Summ. J. ("Pl.'s Mem.") at 5. Consequently, summary judgment is granted, as conceded, to the defendants as to those issues.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    FOIA REQUEST

On June 15, 2012, DHS Secretary Janet Napolitano announced the implementation of a new DHS program called DACA, under which DHS would, in its exercise of prosecutorial discretion, consider for relief from removal from this country or from entering into removal proceedings, "certain young people who were brought to the United States as young children, do not present a risk to national security or public safety, and meet several key criteria." *See* Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. & Supp. Pl.'s Cross-Mot. Partial Summ. J. ("Pl.'s Mem.") at 1, ECF No. 17 (quoting Department of Homeland Security Press Release dated June 15, 2012). In addition, individuals subject to the DACA program would be "eligible for employment authorization during the period their removal action is deferred." Decl. of John R. Sandweg, Acting General Counsel of DHS ("Sandweg Decl.") ¶ 4, ECF No. 19-1. Secretary Napolitano issued a corresponding memorandum to the U.S. Customs and Border Protection, U.S. Citizenship and Immigration Services, and U.S. Immigration Customs Enforcement agencies instructing the agencies on implementation of the DACA program.  Pl.'s Mem. at 2 –3.

The plaintiff, a non-profit foundation, submitted FOIA requests to DHS and to the DOJ Office of Legal Counsel ("OLC") on June 22, 2012, seeking: "[a]ll records concerning, regarding, or relating to [DHS'] decision to exercise prosecutorial discretion with respect to individuals who came to the United States as children as outlined in a June 15, 2012, Memorandum by Secretary Napolitano." *See* Decl. of James V. M. L. Holzer ("Holzer Decl."), Ex. A at 1, ECF No. 15-3;[2] Decl. of Paul P. Colborn ("Colborn Decl.") Ex. 1 at 1–2, ECF No.

---

[2] The exhibits attached to the Holzer Declaration are not marked with any exhibit number or letter. *See* Exhibit Holzer Decl., ECF No. 15-4.  Consequently, the exhibits are identified here by letters A–E according to references to the exhibits in the text of the Holzer Declaration.

15-11. The request to DHS specified that this included "communications, meeting notes and agenda, briefing materials, and policy memoranda," and also requested "[a]ll records concerning, regarding, or relating to the legal authority for the DHS decision . . . ." Holzer Decl. Ex. A at 1.

## B. THE PLAINTIFF'S LAWSUIT AND AGENCIES' RESPONSES TO FOIA REQUESTS

The plaintiff filed suit on August 15, 2012, to compel the defendants to conduct reasonable searches and produce non-exempt records pursuant to the plaintiff's FOIA requests, as well as to award the plaintiff attorneys' fees and other litigation costs. Complaint ("Compl.") ¶ 18, ECF No. 1. At that time, DHS and OLC were still reviewing potentially responsive records. *See* Holzer Decl. ¶ 12; Colborn Decl. ¶ 9–11.

The following month, OLC informed the plaintiff that, out of the eighty responsive documents identified in the agency's search, six documents were produced, one was referred to the DOJ's Office of Information Policy, and the remaining records were withheld pursuant to FOIA Exemption 5. *See* Colborn Decl., Ex. 3 at 1.

DHS identified 2,039 responsive pages of documents and, in three separate releases on February 27, 2013, March 1, 2013, and March 4, 2013, produced 387 pages to the plaintiff in their entirety and 322 pages with redactions. *See* Holzer Decl., Exs. C–E at 7–12.[3] DHS withheld the remaining pages claiming they were exempt from disclosure under FOIA Exemption 5, as subject to the deliberative process privilege and/or the attorney-client privilege, as well as Exemptions 6 and 7E. *See* 5 U.S.C. § 552(b)(5)–(7). *See* Holzer Decl. ¶¶ 22–35.

---

[3] The Holzer declaration appears to contain a slight discrepancy in the number of pages released by DHS. According to the cover letter of DHS' second interim response, dated March 1, 2013, DHS released 16 pages in their entirety and partially released 163 pages. *See* Holzer Decl. Ex. D at 9. By contrast, the Holzer declaration itself summarizes the second interim response as disclosing 33 pages in full and 162 pages in part. *See* Holzer Decl. ¶ 20. This discrepancy is immaterial to resolution of the pending motions.

The defendants' pending motion for summary judgment argues that the search for records responsive to the plaintiff's request was adequate, Defs.' Mem. Supp. Defs.' Mot. Summ. J. ("Defs.' Mem.") at 3–9, ECF No. 15-1, and that records were properly withheld under Exemptions 5, *id.* at 9–16, 6, and 7E, *id.* at 17–19. In its cross-motion for partial summary judgment, the plaintiff "elected not to challenge the reasonableness of the searches and a majority of the withholdings," but contends that DHS is improperly withholding two records, which are listed as Documents 6 and 7 on the *Vaughn* index produced with DHS' first interim response on February 27, 2013. Pl.'s Mem. at 5; *see also Vaughn* Index, DHS First Release at 2, ECF No. 15-5. DHS subsequently submitted an updated *Vaughn* Index, *see* Pl.'s Mem. at 7 n.1; *id.* Ex. A at 3–4 ("Updated *Vaughn* Index"), which provides additional detail regarding the justification for the withholding of Documents 6 and 7.[4]

## C. THE TWO CHALLENGED DOCUMENTS

As noted, the plaintiff is challenging the withholding by DHS of only two documents. According to the Updated *Vaughn* Index and a supplemental declaration submitted by the Acting General Counsel of DHS, Document 6 is a four-page, single-spaced memorandum, dated June 14, 2012, for Secretary Napolitano from DHS General Counsel Ivan Fong titled "Authority to Exercise Deferred Action for a Discrete Class of Individuals." *See* Updated *Vaughn* Index at 3; Sandweg Decl. ¶ 7. This record was withheld in full under Exemption 5 "to protect from disclosure deliberative communications and privileged attorney-client communication regarding the adoption of a new departmental policy pertaining to the Deferred Action Process." Updated

---

[4] DHS' initial *Vaughn* index, released with its February 27, 2013, production of records indicated that Documents 6 and 7 were withheld pursuant to the attorney work product privilege in addition to the deliberative process privilege and the attorney-client privilege. *See Vaughn* Index, DHS First Release at 2. DHS' Updated *Vaughn* Index, submitted on March 27, 2013, claimed only the deliberative process privilege and the attorney-client privilege with regard to Documents 6 and 7, thereby dropping the work product privilege as a basis for withholding. *See* Updated *Vaughn* Index at 3–4.

*Vaughn* Index at 3. It is undisputed that Document 6 is a "summary of a White Paper on

Deferred Action" that "discusses in detail, the Secretaries [sic] authority to grant deferred

action." *Id*; *see also* Sandweg Decl. ¶ 7 (indicating that document 6 summarizes document 7);

Pl.'s Mem. at 8 ("Document 6 is a summary of Document 7.").

 Document 7, also dated June 14, 2012, is described in the Updated *Vaughn* Index and

supplemental declaration as a 21-page white paper on deferred action. Updated *Vaughn* Index at

3–4; Sandweg Decl. ¶ 7.[5] This White Paper was authored by DHS' Office of General Counsel

and was withheld in full under Exemption 5 because it contained "deliberative communications

and privileged attorney-client communication." Updated *Vaughn* Index at 4; *see also* Sandweg

Decl. ¶¶ 7–11. The document "outlines the Secretaries [sic] general authority to exercise

prosecutorial discretion as part of her charge to enforce the immigration laws." Updated *Vaughn*

Index at 4.

Both documents are marked "PRIVILEGED ATTORNEY-CLIENT

COMMUNICATION," Sandweg Decl. ¶ 6, and "PREDECISIONAL AND DELIBERATIVE,"

*id.* ¶ 11, and both discuss the DHS Secretary's "authority to exercise deferred action" using

"legal issues, relevant case law, assessments of judicial review, statutory responsibilities, legal

authority to enforce immigration laws, and options to reduce legal risk." *Id.* ¶ 7. Both

documents were created and submitted to the Secretary of DHS in response to "the Secretary's

request for legal advice from DHS's Office of the General Counsel (OGC), and were intended as

confidential legal advice." *Id.* ¶ 8. The documents were "concurrent with" and "part of a

discussion about potential approaches to the proposed deferred action policy and legal

considerations." *Id.* ¶ 11. The issues "were being considered by Senior Department officials," *id.*

---

[5] The Bates numbers that identify this document indicate that the document is twenty pages long, not twenty-one
pages. *See* Updated *Vaughn* Index at 3–4 (listing Bates numbers for Document 7 as spanning 01057–01077). The
discrepancy does not affect the Court's analysis.

¶ 11, and "helped to inform and guide the Secretary in arriving at the final decision." *Id.* ¶ 12.

The plaintiff seeks release of these two documents on grounds that they are improperly withheld

under Exemption 5 or, in the alternative, asks the Court to conduct *in camera* review of the

documents before ruling on DHS' exemption claim. Pl.'s Mem. at 8–13.

## II. LEGAL STANDARD

### A. FOIA

Congress enacted the FOIA to promote transparency across the government and " 'permit

access to official information long shielded unnecessarily from public view.' " *Milner v. U.S.*

*Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)).

The Supreme Court has explained that the FOIA is "a means for citizens to know 'what their

Government is up to.' This phrase should not be dismissed as a convenient formalism. It

defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish,*

541 U.S. 157, 171–72 (2004) (citation and internal quotation marks omitted). "The basic

purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic

society, needed to check against corruption and to hold the governors accountable to the

governed." *NLRB v. Robbins Tire & Rubber Co*, 437 U.S. 214, 242 (1978); *see also SEC v. Am.*

*Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013) ("The public has a fundamental interest in 'keeping a

watchful eye on the workings of public agencies.' " (quoting *Wash. Legal Found. v. U.S.*

*Sentencing Comm'n*, 89 F.3d 897, 905 (D.C. Cir. 1996))). To this end, the FOIA requires federal

agencies to release all records responsive to a request for production unless the responsive

records fall within one of nine exemptions. *See* 5 U.S.C. § 552(a)(3)(A), (b); *Mink*, 410 U.S. at

79.

The exemptions, under 5 U.S.C. § 552(b), permitting agencies to withhold information from FOIA disclosure, are designed to protect "legitimate governmental and private interests [that] could be harmed by release of certain types of information." *United Techs. Corp. v. U.S. Dep't of Def.,* 601 F.3d 557, 559 (D.C. Cir. 2010) (internal quotation marks omitted). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 131 S.Ct. at 1262 (citations and internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) ("FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure.") (citation omitted). Upon exhaustion of administrative remedies, a FOIA requester may file a civil action challenging an agency's response to its request. *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004). Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate. *See id.* at 678. Federal courts are authorized under the FOIA "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

### B. Summary Judgment

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). When an agency's response to a FOIA request is to withhold responsive records, either in whole or in part, the agency "bears the burden of proving the applicability of claimed exemptions." *Am. Civil Liberties Union v. U.S. Dep't of Def.* ("*ACLU/DOD* "), 628 F.3d 612, 619 (D.C. Cir. 2011). The government may sustain its burden of establishing that requested records were appropriately withheld through the

submission of declarations detailing the reason that a FOIA exemption applies, along with an index, as necessary, describing the materials withheld. *See, e.g., id.* at 619; *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 840 (D.C. Cir. 2001); *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU/DOD*, 628 F.3d at 619; *see also Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (" '[S]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.' " (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006) and *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994))). While the burden remains on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), in FOIA cases, "an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.' " *ACLU/DOD*, 628 F.3d at 619 (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## III. DISCUSSION

The two challenged documents that remain at issue in this litigation, Documents 6 and 7, as identified in DHS' Updated *Vaughn* Index, are being withheld by DHS pursuant to the deliberative process privilege and the attorney-client privilege under Exemption 5. Pl.'s Mem.at

7. FOIA Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In construing "this somewhat Delphic provision," *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 11 (1988), the Supreme Court has held that, to be properly withheld under Exemption 5, "a document must . . . satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n* ("*Klamath Water*"), 532 U.S. 1, 8 (2001).

The challenged documents were drafted by DHS' Office of General Counsel or the DHS General Counsel and directed to DHS Secretary Napolitano. Sandweg Decl. ¶ 7–8. Thus, the plaintiff does not dispute that they are "inter-agency or intra-agency memorandums or letters." *See* 5 U.S.C. § 552(b)(5); Pl.'s Mem. at 8–13. The only issue is whether the documents "fall within the ambit of a privilege against discovery." *Klamath Water*, 532 U.S. at 8. Exemption 5 incorporates those civil discovery privileges enjoyed by any private party in litigation, including the attorney-client and attorney work product privileges, and the deliberative process privilege, which "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Id.* at 8 (quoting *NLRB v. Sears, Roebuck & Co.* ("*Sears*") , 421 U.S. 132, 150 (1975)); *see also Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008); *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006); *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 601 (D.C. Cir. 2001). The Supreme Court has acknowledged that "[t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news"

and, thus, "its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." *Klamath Water*, 532 U.S. at 8–9 (citations omitted); *see also Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) ("the deliberative process privilege . . . reflect[s] the legislative judgment that 'the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl because the full and frank exchange of ideas on legal or policy matters would be impossible'" (internal quotation marks omitted) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977))).

Nevertheless, "[i]n keeping with the Act's policy of the fullest responsible disclosure, Congress intended Exemption 5 to be as narrow as is consistent with efficient Government operations." *FTC v. Grolier, Inc.*, 462 U.S. 19, 23 (1983) (citation omitted); *see also Sears*, 421 U.S. at 149 ("[I]t is reasonable to construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context.").

As explained below, DHS has met its burden of showing that invocation of the deliberative process privilege is appropriate and that the two challenged documents are exempt from disclosure.

### A.  Parameters of the Deliberative Process Privilege

Before evaluating whether the two challenged documents fall within the deliberative process privilege, the Court first examines the prerequisites for invocation of this privilege. The D.C. Circuit has explained that "[t]o qualify for Exemption 5 protection under the deliberative process privilege, 'an agency's materials must be both predecisional and a part of the deliberative process.' " *Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680 n.4 (D.C. Cir. 2008) (internal quotation marks omitted) (quoting *Formaldehyde Inst. v. U.S.*

*Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989)). "[T]he word 'deliberative' as used in the law of Exemption 5 is considerably narrower than the colloquial meaning; as a consequence, the 'deliberative' and 'predecisional' requirements tend to merge. Both terms have come to apply only to documents that contribute to an ongoing deliberative *process* within an agency." *Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (emphasis in original). Consequently, the law is well-settled that "[t]he agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.' " *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States Gas Corp. v. Dep't of Energy* ("*Coastal States*"), 617 F.2d 854, 868 (D.C. Cir. 1980)). Merely stamping on the face of the documents that they are subject to the deliberative process privilege is not sufficient. *See Fox News Network, LLC v. U.S. Dep't of the Treasury*, 678 F. Supp. 2d 162, 168 (S.D.N.Y. 2009) (finding that it is not "an article of faith that a document labeled 'Draft' is automatically protected by the deliberative process privilege") (citing *New York Times Co. v. U.S. Dep't of Def.,* 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007)). Instead, at least four inter-related factors may be gleaned from the case law as significant in making the fact-specific determination that a responsive document is properly withheld under the deliberative process privilege.

First, courts determine whether a document is predecisional by looking at the timing of the document's release relative to the date the decision is made. *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (finding "a document predecisional if 'it was generated before the adoption of an agency policy' ") (citing *Coastal States*, 617 F.2d at 866); *COMPTEL v. FCC*, 910 F. Supp. 2d 100, 121 (D.D.C. 2012) (same); *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 905 F. Supp. 2d 206, 217–18 (D.D.C. 2012) (predecisional means "antecedent

to the adoption of an agency policy" (quoting *Jordan v. U.S. Dep't of Justice,* 591 F.2d 753, 774

(D.C. Cir. 1978) (*en banc*), *overruled in part on other grounds, Crooker v. ATF,* 670 F.2d 1051

(D.C. Cir. 1981) (*en banc*))); *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't*

*of Labor*, 828 F. Supp. 2d 183, 189 (D.D.C. 2011) ("The timing of a record is important in the

analysis; communications made after a decision has been made and designed to explain that

decision are not privileged under Exemption 5.") (citing *Sears,* 421 U.S. at 151–52).

Second, courts look to the relationship between the author and recipient of the document

to determine whether a person in the author's position, particularly a subordinate, would

typically provide advice to a person in the recipient's position as part of the decision-making

process.  *See Schlefer v. United States,* 702 F.2d 233, 238 (D.C. Cir. 1983) ("Intra-agency

memoranda from 'subordinate' to 'superior' on an agency ladder are likely to be more

'deliberative' in character than documents emanating from superior to subordinate," and finding

that with respect to Chief Counsel opinions sought in FOIA request, "the Chief Counsel and

requesting officials ultimately occupy a superior-subordinate relationship" rendering deliberative

process privilege inapplicable); *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 679

(D.C. Cir. 1981) ("[F]actor to be considered in determinations with respect to . . . the deliberative

process privilege is the nature of the decisionmaking authority vested in the office or person

issuing the disputed document."); *Vaughn v. Rosen*, 523 F.2d 1136, 1146 (D.C. Cir. 1975)

(finding that "Exemption 5 is designed to protect subordinates' advice to superiors"); *Arthur*

*Andersen & Co. v. IRS*, 679 F.2d 254, 259 (D.C. Cir. 1982) (noting that documents were

deliberative in part because the "flow of the documents was from subordinate to superior");

*Brinton v. U.S. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) (noting that the "flow of

advisory material is exactly opposite to the paradigm of 'final opinions,' which typically flow

from a superior with policy-making authority to a subordinate who carries out the policy").

The D.C. Circuit stressed this second factor over twenty years ago in considering

Exemption 5, explaining that:

> [a] key feature under both the 'predecisional' and 'deliberative' criteria is the
> relation between the author and recipients of the document. A document from a
> junior to a senior is likely to reflect his or her own subjective opinions and will
> clearly have no binding effect on the recipient. By contrast, one moving from
> senior to junior is far more likely to manifest decisionmaking authority and to be
> the denouement of the decisionmaking rather than part of its give-and-take.

*Access Reports*, 926 F.2d at 1195. In that case, the Circuit reversed the district court and found

that Exemption 5's deliberative process privilege justified the withholding of a memorandum,

which was drafted by a staff attorney at the request of superiors and contained legal analysis

about pending legislation that had already been forwarded by the agency to Congress. *Id.* at

1193, 1197. The Court noted the deliberative nature of the challenged document since it was

"ammunition for the expected fray, in part as advice on whether and when to duck." *Id.* at 1196.

Notably, as in *Access Reports*, documents generated by legal counsel within agencies to advise

more senior officials regarding a decision to be made by the latter have regularly been found

subject to the deliberative process privilege. *See, e.g., Arthur Andersen & Co.*, 679 F.2d at 259

(finding that drafts of documents reviewed by the Office of Chief Counsel and others were

deliberative because "all the participants [reviewing the document] up to the Commissioner were

without authority to make a final determination"); *Brinton*, 636 F.2d at 602 (exempting from

disclosure memoranda containing legal advice from the Legal Adviser to the Secretary of State

in part because documents "originated in the Office of the Legal Adviser, who has no authority

to make final decisions . . . [i]nstead, his role is to give advice to those in the State Department

who do make the policy decisions"); *Murphy v. U.S. Dep't of Army*, 613 F.2d 1151, 1154 (D.C.

Cir. 1979) (holding that privilege covers memoranda from Army General Counsel to Assistant

Secretary advising on whether to enter into a contract).

Even if the relationship between the author and recipient of challenged records is not one

of subordinate and superior officials, when the role of the author is as an advice-giver rather than

a decision-maker, this militates in favor of the document qualifying as part of the deliberative

process. *See, e.g.*, *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 8 (D.C. Cir. 2014)

(finding that OLC legal memorandum prepared at request of FBI did not "establish the 'working

law' of the FBI" and was covered under the deliberative process privilege); *Renegotiation Bd. v.

Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 185 (1975) (holding that Regional Board Reports

were predecisional and deliberative in part because the authors "had no legal authority to decide"

the particular issue which "only the [Renegotiation] Board could decide").

Due to the significance of this second factor, the agency "must describe 'the nature of

the decisionmaking authority vested in the office or person issuing the disputed document(s), and

the positions in the chain of command of the parties to the documents.' " *Elec. Frontier Found.

v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (quoting *Arthur Andersen &

Co.*, 679 F.2d at 258).

Third, courts assess the nature of the discussion in the challenged document and,

specifically, whether it sets out the author's view of options and considerations regarding an

agency's policy or, rather, explains or expresses the policy itself. *See Coastal States*, 617 F.2d at

866 (deliberative documents include "recommendations, draft documents, proposals,

suggestions, and other subjective documents which reflect the personal opinions of the writer

rather than the policy of the agency"); *Elec. Frontier Found.,* 739 F.3d at 8 ("[T]he deliberative

process privilege *does* cover legal memoranda that concern the *advisability* of a particular policy,

but do not authoritatively state or determine the agency's policy." (emphasis in original));

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 949 F. Supp. 2d 225,

234, 236 (D.D.C. 2013) (emails among agency lawyers discussing how to respond to press

inquiry was deliberative) (collecting cases). "Virtually all of the courts that have thus far applied

Exemption 5 have recognized that it requires different treatment for materials reflecting

deliberative or policy-making processes on the one hand, and purely factual, investigative

matters on the other." *Mink*, 410 U.S. at 89. Consequently, the privilege does not apply to "final

statements of agency policy or to statements that explain actions that an agency has taken. . . .

[I]t protects 'predecisional communications' reflecting an agency's internal deliberations, but not

communications that explain a decision that has already been made." *Tax Analysts v. IRS*, 294

F.3d 71, 80 (D.C. Cir. 2002) (citing *Sears*, 421 U.S. at 151–52) (internal citations omitted). *See*

*also Elec. Frontier Found.*, 739 F.3d at 10 (OLC opinion for FBI was deliberative because it did

not establish "working law" of the FBI). Thus, even records created in response to internal

requests for "advice" from agency lawyers may not be properly withheld under the deliberative

process privilege when the records merely reflect statements of extant agency policy. *See Tax*

*Analysts*, 117 F.3d at 617 ("FSAs [Field Service Advice memoranda] are themselves statements

of an agency's legal position. . . .[and] do not reflect the 'give-and-take' that characterizes

deliberative materials."); *Schlefer*, 702 F.2d at 235, 244 ("summary-indexes of significant

written opinions" prepared by the Maritime Administration's Chief Counsel are not deliberative

because they were statements of agency policy not advisory opinions).

Finally, courts inquire as to whether the document was responsive to a request,

particularly a request from a senior official with decision-making authority to a subordinate in an

advisory position. *See Murphy*, 613 F.2d at 1154 (finding "classic case of the deliberative

process at work" where Assistant Secretary with decision-making power "sought advice from the General Counsel of his department on the legal questions" raised by impending decision); *Ctr. for Nat. Sec. Studies v. I.N.S.*, No. 87-2068(RCL), 1990 WL 236133, at *4–5 (D.D.C. Dec. 19, 1990) (finding that challenged documents were predecisional in part because they were drafted by a committee that was asked to produce the documents "to the Attorney General and the White House").

Set against these four factors, the Court now turns to analysis of the application of the deliberative process privilege to the two challenged documents.

## B. THE CHALLENGED DOCUMENTS ARE PREDECISIONAL AND DELIBERATIVE

The plaintiff challenges the withholding of the two documents under the deliberative process privilege on grounds, first, that they could not have formed part of the deliberative process because of their timing; and, second, that DHS has presented insufficient information to evaluate whether they are either deliberative or predecisional. Each of these challenges is addressed *seriatim* below.

### 1. Timing of Challenged Documents

The two challenged documents are dated June 14, 2012, the day before the Secretary made the public announcement of her final decision on June 15, 2012. *See* Sandweg Decl. ¶ 11. DHS contends that this timing establishes that the documents were predecisional. *See id.* ¶¶ 11–12; Defs.' Opp'n Pl.'s Summ. J. Mot. & Reply Supp. Defs.' Mot. ("Defs.' Reply") at 5, ECF No. 19. The plaintiff disputes this, claiming that submission of the challenged documents so close in time to the public announcement of the DACA program cuts against finding that the documents are predecisional. *See* Pl.'s Mem. at 10–11. The Court disagrees with the plaintiff.

The plaintiff relies on two sources of evidence to support its assertion that the challenged documents are not predecisional. First, the plaintiff points to Documents 8 and 10 on the Updated *Vaughn* Index that are described, respectively, as a draft press release regarding the DACA, dated June 14, 2012, and a draft media communications strategy, dated June 12, 2012. Updated *Vaughn* Index at 4, 5–6. The plaintiff does not challenge the withholding of documents 8 and 10 but notes that these documents are dated on or before June 14, 2012, the dates of the two challenged documents. Pl.'s Mem. at 10–11. The plaintiff reasons that "it is illogical that a media strategy be developed prior to any final decision on a new program," Pl.'s Mem. at 11, and that by the dates of the draft communications strategy on June 12, 2012 or draft press release on June 14, 2012, DHS must, therefore, have made a final decision. *Id.* Based on this reasoning, the plaintiff contends that the challenged documents "were clearly created *after* Secretary Napolitano made a decision to exercise prosecutorial discretion with respect to DACA" and must be "no more than an explanation of the new program." *Id.* (emphasis in original); *see also* Updated *Vaughn* Index at 3–6. As such, according to the plaintiff, the challenged documents are post-decisional and not exempt under the deliberative process privilege. Pl.'s Mem. at 9.

The fact that the challenged documents were dated a day before the DHS Secretary publicly announced the DACA program on June 15, 2012, does not automatically render them post-decisional. *See Fox News Network, LLC v. U.S. Dep't of The Treasury*, 739 F. Supp. 2d 515, 558 (S.D.N.Y. 2010) (noting that portions of email thread reflecting "Treasury legal's suggestion to Treasury decisionmakers regarding their final sign-off" "the day prior to its final release" was "both deliberative and predecisional" and, thus, was properly redacted under Exemption 5). On the contrary, this chronology shows that the documents were "generated before the adoption of an agency policy." *Judicial Watch Inc.*, 449 F.3d at 151 (quoting *Coastal*

*States*, 617 F.2d at 866). The drafting of the challenged documents in the weeks leading to their issuance on June 14, 2012 was concurrent with discussions on legal and policy considerations of the program. Sandweg Decl. ¶ 11. Moreover, DHS has confirmed that the documents formed part of a discussion weeks before they were issued and "were being considered" up to the June 15, 2012 announcement. *Id.* DHS has explained that the concurrent development of a media and communications strategy and the legal analysis of the DACA program were a part of the agency's deliberative process. *Id.* ¶ 12. Indeed, the fact that the media and communications strategy are both described as draft documents on the Updated *Vaughn* Index confirms, rather than undercuts, the agency declarant's assertion that "[s]ubstantive legal and policy aspects of the DACA decision were under review at the time the communications plan was developed." *Id.*

Second, the plaintiff points to internal DHS email exchanges leading up to June 15, 2012. Pl.'s Reply Supp. Cross-Mot. Partial Summ. J. ("Pl.'s Reply") at 3. According to the plaintiff, these emails contain "undisputable evidence" "clearly show[ing] that a decision was made prior to June 14, 2012." *Id.* Contrary to the plaintiff's characterization of "undisputable evidence," review of these emails indicate that the DACA policy was evolving up until the very date of the announcement. *See* Decl. of Matthew S. Kownacki ("Kownacki Decl.") Exs. A–B, ECF No. 20-1. For example, emails generated the day before the announcement and the same day the challenged documents were delivered to the Secretary on June 14, 2012, show that edits were still underway on the new policy. S*ee* Kownacki Decl. Ex. B at 48 (email dated June 14, 2012, at 1:27 PM noting White House counsel's edits to a directive and asking for a discussion of the changes); *id.* at 87 (email dated June 14, 2012, at 5:26 PM discussing the "most recent criteria"); *id.* at 108 (email dated June 12, 2012, 1:41 PM proposing "a road map of what needs to be done and the documents that we need to prepare, as well as to clarify the policy decisions that we will

need to discuss further"); *see also* Kownacki Decl. Ex. A at 27–28 (email thread dated June 13, 2012, at 11:44 AM with the subject line "Re: Draft Release," discussing adding edits "on the back end," and mentioning that it "[s]till needs some work").

The emails do not contain "undisputable evidence" contradicting DHS' claim that the final decision was made on June 15, 2012, but instead reflect the deliberative process as described by DHS, namely, that the final policy decision and communications and media strategies were developed concurrently and the policy was being edited up until June 15, 2012. *See* Sandweg Decl. ¶¶ 11–12.

Thus, the timing of the submission to the Secretary of the two challenged documents before the Secretary's final announcement, together with the information supplied by DHS regarding the process of finalizing the DACA program, adequately shows that the records were predecisional and "part of a clear 'process' leading to a final decision on the issue." *Coastal States*, 617 F.2d at 868.

> 2. *Sufficiency of DHS' Information To Determine if Challenged Documents Are Deliberative*

The plaintiff claims that DHS has not included enough information in the original and Updated *Vaughn* Indices describing the documents to warrant a determination that the documents are deliberative because the agency makes "barren assertions" that the documents were part of the deliberative process and "quot[es] the statutory language of the exemption." Pl.'s Mem. at 9 –10 (citations omitted). In response, DHS submitted with its opposition a declaration by DHS' Acting General Counsel supplementing the information about Documents 6 and 7. *See generally* Sandweg Decl. Having already determined, first, that the timing of the challenged documents with respect to the final decision indicates that the documents are predecisional, the Court next considers the remaining three factors outlined in Section III.A., *supra,* to determine whether

DHS has met its burden of showing that the challenged documents "were created as part of the decision-making process, and [] helped to inform and guide the Secretary in arriving at the final decision." *Id.* ¶ 12.

DHS has shown that the second factor, the relationship between the originating author and the recipient of the document, supports a finding that the documents were deliberative. The Updated *Vaughn* Index and DHS' declarations identify the author and recipient of the documents: Document 6 was drafted by DHS General Counsel Ivan Fong, and Document 7 was drafted by DHS' General Counsel's Office at the request of the DHS Secretary, and both documents are directed to the DHS Secretary. *See* Updated *Vaughn* Index at 3–4; Sandweg Decl. ¶ 8. The General Counsel's Office and the DHS General Counsel are subordinate to the Secretary, who had the final authority to issue the DACA program. *See Schlefer*, 702 F.2d at 238 (noting flow of agency record "from 'subordinate' to 'superior' on an agency ladder" "more 'deliberative' in character") (citing *Sears*, 421 U.S. at 155). This "flow of the documents [] from subordinate to superior," is strong evidence that these documents were part of a deliberative process and were considered by those who had the authority to make a final decision. *See Arthur Andersen & Co.*, 679 F.2d at 259. *Cf. Muttitt v. U.S. Dep't of State*, 926 F. Supp. 2d 284, 306–07 (D.D.C. 2013) (finding that defendant did not include requisite detail to show that documents were deliberative where agency failed to identify the official or agency engaging in a series of email exchanges, the topic, or the date of the exchanges").

Moreover, the fact that the authors of these documents were lawyers whose role is to provide legal advice also confirms that these records were deliberative. *Brinton*, 636 F.2d at 602. DHS has also shown that the documents were intended as legal advice, Sandweg Decl. ¶¶ 8, 11, 13, and "[t]here can be no doubt that such legal advice, given in the form of intra-agency

memoranda prior to any agency decision on the issues involved, fits exactly within the deliberative process rationale for Exemption 5." *Elec. Frontier Found.*, 739 F.3d at 9 (citing *Brinton*, 636 F.2d at 604); s*ee also Vaughn*, 523 F.2d at 1143–44 (observing that a deliberative document is "a direct part of the deliberative process" and makes "recommendations or expresses opinions on legal or policy matters"). DHS has demonstrated that the documents helped "inform and guide the Secretary in arriving at the final decision . . . on June 15, 2012," Sandweg Decl. ¶ 12, and that the issues were considered "by senior Department officials up until" the Secretary's announcement on June 15, 2012. *Id.* ¶¶ 11–12. This confirms DHS' claim that the documents were part of the deliberative process.

The third factor regarding the nature of the discussion within the challenged documents also supports a finding that they are deliberative. As noted, the challenged documents contain legal advice, which is typically considered part of a deliberative process. *See Elec. Frontier Found.*, 739 F.3d at 8 (noting that "the deliberative process privilege *does* cover legal memoranda that concern the *advisability* of a particular policy" (emphasis in original)). DHS further describes the contents of the two challenged documents as discussing legal issues and legal authorities as well as "options to reduce legal risk." *See* Sandweg. Decl. ¶ 7. The contents of the two challenged documents were "part of a discussion about potential approaches to the proposed deferred action policy and legal considerations," and "were created as part of the decision-making process." Sandweg Decl. ¶¶ 11–12. Such legal advice is highly indicative that the records contributed to the Secretary's decisionmaking. Thus, consideration of this factor also shows that these documents were part of a deliberative process.

Finally, the defendants have shown that the challenged documents were created in response to the Secretary's request for legal advice regarding her DACA decision. *See* Sandweg

Decl. ¶ 8. Since the Secretary sought out legal advice to inform her final policy decision, this further confirms that this decision was intended to form part of her decisionmaking process. *See Murphy*, 613 F.2d at 1154.

The cases relied upon by the plaintiff to support its contention that DHS' description of the documents is insufficient are inapposite. Pl.'s Mem. at 9–10, 12. *Founding Church of Scientology of Wash., D.C., Inc., v. Nat'l Sec. Agency*, 610 F.2d 824 (D.C. Cir. 1979), is distinguishable not only because exemption 3, not 5, was at issue, but also because the affidavit in that case summarily stated that disclosure would "reveal certain functions and activities . . . which are protected from mandatory disclosure" and which "would jeopardize national security functions." *Id.* at 831. The conclusory statement and lack of specificity in the agency affidavit in *Founding Church* are distinguishable from the factual assertions and detail produced in DHS' declaration here. *See* Sandweg Decl. ¶¶ 7–8, 11–12. As noted, the Sandweg Declaration details the author and recipient of the documents, the nature of the discussions within the document, and how the document formed part of the agency's process in the weeks leading up to the announcement of the final decision on June 15, 2012.

The plaintiff also relies on *Army Times Pub. Co. v. U.S. Dep't of Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993), as support for its view that the agency declarations are insufficient, Pl.'s Mem. at 10, but that case is also distinguishable. The plaintiff claims that in *Army Times Pub. Co.*, the Circuit found it insufficient for an affidavit to merely "parrot[] the case law." *Id.* at 1070; *see also* Pl.'s Mem. at 10. The Circuit, however, did not decide that the affidavit was insufficient because it restated the legal standard. *Id.* at 1071–72. Rather, in that case, the agency claimed that documents related to internal poll results had to be withheld to avoid harming the Air Force's deliberative process even though the agency had already disclosed

portions of the documents without ill result. *Id.* at 1068, 1070–71. The affidavit was thus

insufficient because the agency's action undercut its own justifications for withholding. *Id.* No

such circumstances are present here.

Finally, the plaintiff further contends that the Sandweg declaration "simply cannot satisfy

DHS' burden under FOIA" because it is "self-serving." *See* Pl.'s Reply at 2. To the contrary, in

FOIA cases, agency declarations or affidavits are viewed with "a presumption of good faith,

which will withstand purely speculative claims about the existence and discoverability of other

documents." *See Ground Saucer Watch v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981) (dismissing

plaintiff's barren assertions of bad faith in the agency's affidavits regarding its search for

records).

In sum, DHS has sufficiently demonstrated that the two challenged documents were

predecisional and part of the deliberative process, and therefore properly withheld from

disclosure under Exemption 5.[6] With this finding, the Court need not decide whether the

documents were also properly withheld under the attorney-client privilege. *See Elec. Frontier

Found.*, 739 F.3d at 4 (court did not discuss other reasons for withholding after concluding that

deliberative process privilege applied to withheld document); *Brinton*, 636 F.2d at 606 ("Further

development of the record . . . [to] show that the attorney-client privilege applies" "is not now

necessary" because the deliberative process privilege was applicable); *Darui v. U.S. Dep't of*

---

[6] The plaintiff requests, in the alternative, that the Court conduct an *in camera* review of the documents before ruling on the applicability of any exemptions. *See* Pl.'s Mem. at 13. *In camera* review of withheld documents is "generally disfavored," *see PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 253 (D.C. Cir. 1993), and should not be "a substitute for the government's obligation to justify its withholding in publicly available and debatable documents." *Id; see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (same). Since DHS' declarations and Updated *Vaughn* Index are sufficiently clear to show that challenged documents 6 and 7 were properly withheld under the deliberative process privilege, such a review is unnecessary. *See Brinton*, 636 F.2d at 606 ("[D]istrict court was entirely correct in granting summary judgment without conducting an in camera inspection of the documents" where "Department affidavits made a detailed showing of the applicability of the deliberative process ground of Exemption 5 . . . [and] there is no contradictory evidence or evidence of Department bad faith").

*State*, 798 F. Supp. 2d 32, 39 (D.D.C. 2011) ("[T]he Court need not reach" applicability of alternative exemptions once it has concluded that document is properly withheld under one exemption).

### C. Segregability

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Even when a plaintiff does not challenge the segregability efforts of an agency, the Court has "an affirmative duty to consider the segregability issue *sua sponte.*" *Trans-Pac. Policing Agreement v. U.S. Customs Serv.,* 177 F.3d 1022, 1028 (D.C. Cir. 1999); *see also Juarez v. U.S. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008) ("Under this Circuit's law, the district court's failure to address segregability in its memorandum opinion is reversible error."). The D.C. Circuit has acknowledged that establishing the non-segregability of non-exempt material "presents problems for the agency since ... segregability depends entirely on what information is in a document and how it is presented." *Mead Data,* 566 F.2d at 261. Therefore, although "agencies should not be forced to provide such a detailed justification that would itself compromise the secret nature of potentially exempt information," agencies "must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Id.*

To this end, the Circuit has said that "[i]n addition to a statement of its reasons, an agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Id.* Under *Mead Data,* if a small proportion of the information is non-exempt, the agency's explanatory burden is less, and if a larger proportion of the information is non-exempt, "the courts should require a high standard of

proof for an agency claim that the burden of separation justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the exempt information." *Id.* Since *Mead Data*, the Circuit has relaxed this standard, holding that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1117 (D.C. Cir. 2007). Indeed, more recent decisions from the D.C. Circuit have held that an agency may satisfy its segregability obligations by (1) providing a *Vaughn* index that adequately describes each withheld document and the exemption under which it was withheld; and (2) submitting a declaration attesting that the agency released all segregable material. *See, e.g., Loving*, 550 F.3d at 41 (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination"); *Johnson v. Exec. Office for U.S. Att'ys,* 310 F.3d 771, 776 (D.C. Cir. 2002) (upholding agency's segregation efforts based on "comprehensive *Vaughn* index" and "the affidavits of" agency officials).

In the instant case, the defendants have shown that they "conducted a document-by-document review, inspecting each document for any non-exempt 'reasonably segregable' information" and that DHS "released any such reasonable [sic] segregable information" and withheld certain documents entirely if "DHS determined that any factual information contained in those records was not reasonably segregable because the selection of the facts was an integral part of the legal advice and analysis." *See* Holzer Decl. ¶ 36; *see also* Defs.' Mem. at 19–20. The Updated *Vaughn* Index, in conjunction with the agency declarations, provide sufficient detail of the contents of these documents and the steps undertaken by DHS to comply with its segregation obligations, for the Court to conclude that the defendants examined Documents 6

and 7 and disclosed any material that was reasonably segregable. *See Sussman*, 494 F.3d at 1117; *Muttitt*, 926 F. Supp. 2d at 302 (the defendants may satisfy their obligation by providing an adequate description of the withheld documents in the *Vaughn* index and "submitting a declaration attesting that the agency released all segregable material") (citing *Loving*, 550 F.3d at 41).

The plaintiff does not address segregability in its briefs and, thus, fails to present "some 'quantum of evidence'" to suggest that the defendants did not comply with their obligation. *See Sussman*, 494 F.3d at 1117. Accordingly, the Court finds that DHS has satisfied its burden of demonstrating that Documents 6 and 7 were examined and withheld only after considering whether they could disclose any "reasonably segregable portion[s]" of the documents pursuant to their obligation under 5 U.S.C. § 552(b).


## IV. CONCLUSION

For the foregoing reasons, the Court concludes that DHS has sufficiently demonstrated that the two challenged documents are subject to the deliberative process privilege under Exemption 5 of FOIA and, thus, are exempt from disclosure. Accordingly, the defendants' motion for summary judgment is GRANTED, and the plaintiff's cross-motion for partial summary judgment is DENIED. An appropriate Order accompanies this memorandum opinion.


Date: February 28, 2014

_____
BERYL A. HOWELL
United States District Judge